IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DEIDRE DAVIS, as Administrator of the Estate of JAMES DAVIS, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 03 C 5309 |
| OFFICER YOLANDA CARTER, LIEUTENANT ANITA MACKEY, REGINA BOWERS, SERGEANT GRANT MARTIN, and OFFICER GREGORY COLLIER; P. WESTBROOK, R. PATTON, D. MOORE, V. FURLOW, A. HILL, and the COUNTY OF COOK, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

AMY J. ST. EVE, District Court Judge:

In her Third Amended Complaint, Plaintiff Deidre Davis, the administrator of the estate

of James Davis, brings both constitutional and state law claims against Defendant Cook County

and the individual Defendants, who were either employed by the Cook County Sheriff's Office or

by Cermak Health Services during the relevant time period. Before the Court is Defendants'

combined Motions for Summary Judgment. For the following reasons, the Court grants

Defendants' Motions for Summary Judgment.

### BACKGROUND

**I.      Northern District of Illinois Local Rules**

When determining summary judgment motions, the Court derives the background facts

from the parties' Northern District of Illinois Local Rule 56.1 statements. The Local Rules

provide parties with specific details as to how litigants in the Northern District of Illinois should approach summary judgment motions and responses. Local Rule 56.1(a)(3) requires the moving party to provide "a statement of material facts as to which the moving party contends there is no genuine issue." Local Rule 56.1(b)(3) requires the non-moving party to admit or deny every factual statement proffered by the moving party and to concisely designate any material facts that establish a genuine dispute for trial. If a responding party does not admit or deny each fact presented by the movant, the movant's statement may be deemed as admitted. *See Brasic v. Heinemann's Inc.*, 121 F.3d 281, 284 (7th Cir. 1997). If the responding party denies the movant's facts, she must also provide citations to evidentiary material supporting the denial. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). "[W]hen a responding party's statement fails to controvert the facts as set forth in the moving party's statement in the manner dictated by the rule, those facts shall be deemed admitted for purposes of the motion." *Id.* With these principles in mind, the Court turns to the relevant facts of this case.

## II.    Relevant Facts

### A.    The Parties

#### 1.    Plaintiff

Plaintiff Deidre Davis is the administrator of the estate of her deceased husband, James Davis, who died of a cerebral aneurysm while incarcerated at Cook County Jail. (R.81-1, Def.'s Sheriff's Office Employees' Rule 56.1 Stmt. ¶¶ 1, 74.) The decedent, James Davis, had a history of drug and alcohol addiction and in 2000 started a Methadone maintenance program with Substance Abuse Services, Inc. ("SASI"). (*Id.* ¶¶ 16, 17.) On September 27, 2002, Davis reported to Cook County Jail to serve a ten-day sentence for a traffic violation. (*Id.* ¶ 18.) Prior

2

to reporting to jail, Deidre Davis drove her husband to SASI for a dose of Methadone and then drove him to jail. (*Id.* ¶¶ 18, 19.) Upon intake at the jail, James Davis told a Cermak Health Services employee that he was on a Methadone maintenance program. (*Id.* ¶ 20.) During his incarceration from September 27, 2002, through October 2, 2002, no one administered Methadone to Davis. (*Id.* ¶ 21.)

### 2. Defendants

The Office of the Sheriff of Cook County ("Sheriff's Office") employed Defendants Officer Yolanda Carter, Lieutenant Anita Mackey, Officer Gregory Collier, and Sergeant Grant Martin as correctional officers at the Cook County Jail during the relevant time period. (*Id.* ¶¶ 2, 3, 4, 6.) The Sheriff's Office also employed Defendant Regina Bowers as a correctional rehabilitation worker during the relevant time period. (*Id.* ¶ 5.)

Defendant Cook County is a unit of local government that finances the Cook County Jail. (*Id.* ¶ 7.) Cermak Health Services is the entity that provides medical care to detainees at the Cook County Jail. (*Id.* ¶ 8.) Cermak Health Services employed Defendants Peggy Westbrook, Richard Patton, Dalfanita Moore, Victoria Furlow, and Alfonso Hill as paramedics at the Cook County Jail during the relevant time period. (*Id.* ¶¶ 9-13.)

### B. Intake Procedures at the Cook County Jail

Upon entering the Department of Corrections, a correctional medical technician gives the inmate a medical screening. (R.85-1, Def.'s Cermak Health Services Employees' Rule 56.1 Stmt. ¶ 3.) At his intake, James Davis reported that he was taking Methadone, but denied that he had any other medical conditions. (*Id.* ¶¶ 5, 6.) When a prisoner indicates that they are in a Methadone program, the intake technician fills out a Methadone referral card which is then taken

3

to the pharmacy. (*Id.* ¶¶ 7, 8.) After the Cermak Health Services pharmacist verifies that an inmate is in a Methadone program, the pharmacist calls the security desk at the jail to have the individual brought to the pharmacy. (*Id.* ¶ 14.) Here, the pharmacist testified that he did not receive Davis' Methadone referral until Monday, September 30, 2002, and that he verified Davis' Methadone treatment with SASI that same day. (Cermak Def.'s Stmt., Ex. 2, Dep. of Satnam Singh, Ex.2, at 15-16.) The pharmacist further testified that he did not know why Davis was not brought to the pharmacy on September 30, 2002. (*Id.* ¶ 16.)

## C.    Events of October 1, 2002

On the morning of October 1, 2002, some inmates told Officer Collier that Davis was ill and needed medical attention. (Sheriff's Def. Stmt. ¶ 22.) Specifically, the inmates told Officer Collier that Davis "was dope sick because he was coming off drugs" and asked Officer Collier if he could get Davis some help. (*Id.*) Officer Collier told the inmates that he would talk to a social worker and try to get the paramedics to see Davis. (*Id.* ¶ 23.) When Officer Collier first saw Davis that morning, Davis was complaining about his stomach hurting. (*Id.* ¶ 24.)

After the inmates told Officer Collier of Davis' illness, Officer Collier escorted Davis to see Correctional Rehabilitation Worker, Regina Bowers. (*Id.* ¶ 27.) Officer Collier explained to Bowers that Davis needed some medical attention and requested that Bowers call the paramedics' office to get Davis some help. (*Id.*; Cermak Def.'s Stmt. ¶ 18.) Bowers then asked Davis what was wrong with him to which Davis replied that he was dope sick and that his stomach was hurting. (Sheriff's Def.'s Stmt. ¶ 28; Cermak Def.'s Stmt. ¶ 19.) Officer Collier testified that Bowers then called and talked to a paramedic after which Bowers explained to Davis that it may take up to three days to verify that he was in an approved Methadone program.

4

(Sheriff's Def.'s Stmt. ¶ 29.) Officer Collier then left Davis with Bowers. (*Id.* ¶ 31.) After this incident, Officer Collier called his supervisor, Sergeant Martin, to inform him of Davis' situation. (*Id.* ¶ 32.)

At her deposition, Bowers testified that she talked to Davis about his drug use and that she called the paramedics. (*Id.* ¶¶ 34, 35.) Although Bowers does not recall with whom she spoke, the paramedic explained that it would take up to three days for Davis to get Methadone. (*Id.*) Bowers also testified that after she talked to the paramedic, she explained the situation to Davis. (*Id.*) In addition, Bowers testified that she spoke with Sergeant Martin in the presence of Davis to ask Sergeant Martin to excuse Davis from work that day. (*Id.* ¶ 39.) Davis did not work on October 1, 2002. (Sheriff's Def.'s Stmt., Ex. E, Bower Dep., at 34.)

### D. Sergeant Martin's Testimony

Sergeant Martin does not recall James Davis being assigned to Division 2 of the Jail from September 28, 2002, until October 2, 2002. (*Id.* ¶ 41.) Further, Sergeant Martin does not recall whether he was present while Bowers talked to James Davis and Officer Collier on October 1, 2002. (*Id.*) He also has no recollection of whether he talked to James Davis that day, explaining that Dorm 4, where Davis was assigned, houses 600 individuals. (*Id.* ¶¶ 41, 42.) Sergeant Martin further testified that it was his practice that when he was informed that an inmate was in no shape to work, he would personally talk to the inmate. (*Id.* ¶ 43.) Also, Sergeant Martin testified that it was very common that inmates in Dorm 4 did not go to work and that it happens more than once a day. (*Id.*)

### E. Deidre Davis' Testimony

Between September 27 and September 30, 2002, Deidre Davis did not visit her husband

while he was incarcerated at Cook County Jail, nor did she have any telephone conversations with him. (*Id.* ¶ 44.) Around 12:45 p.m. on October 1, 2002, Deidre Davis had a telephone conversation with James Davis during which he told her that he had not been medicated, that he was in severe pain, and that he could not keep anything in his stomach. (*Id.* ¶ 45.) Deidre Davis further testified that her husband said the jail guards were ignoring his requests for medical treatment. (*Id.*)

According to Deidre Davis' deposition testimony, after she spoke with her husband, she called the main number at the jail and talked with a "Sergeant" Carter. (*Id.* ¶ 46.) She testified that she explained to Sergeant Carter that her husband was on a Methadone program and that he had not been treated for a few days. (*Id.* ¶ 47.) Also, she explained that her husband was in severe pain. (*Id.*) She further testified that Sergeant Carter replied that Cook County does not work that fast and that maybe Davis would get something the next day. (*Id.*)

### F.    Officer Yolanda Carter's Testimony

On October 1, 2002, "Officer" Yolanda Carter was assigned as a security officer to Division 2 in Dorm 1 in the Cook County Jail. (*Id.* ¶ 49; R.98-1, Pl.'s Add'l Facts, ¶ 37.) At that time, James Davis was located in Division 2, Dorm 4. (Sheriff's Def.'s Stmt. ¶ 21.) While in the security office, Officer Carter did not have any contact with the inmates. (*Id.* ¶ 49.) In general, when Officer Carter received telephone calls from family members of inmates regarding their health, she transferred the calls to the supervisor of the dorm where the inmates were housed. (*Id.* ¶ 51.) Finally, Officer Carter had no recollection of talking to Deidre Davis or any family member of James Davis during the relevant time period. (*Id.* ¶ 52.)

6

## G.    Paramedics' Testimony

Paramedic Peggy Westbrook was working as an Emergency Response Technician on

October 1, 2002, and has no recollection of a telephone call pertaining to Davis. (Cermak Def.'s

Stmt. ¶ 25.) Paramedic Richard Patton, a Correctional Medical Technician, has no recollection

of a telephone call from Regina Bowers on October 1, 2002. (*Id.* ¶¶ 26, 27.) Further, Patton

does not recall Davis approaching him and asking for any medical services. (*Id.* ¶ 28.)

Paramedic Dalfanita Moore was working in Division 2 on October 1, 2002, and did not receive a

telephone call from Regina Bowers. (*Id.* ¶¶ 29, 30.) Paramedic Alfonso Hill did not talk to

Bowers on the telephone concerning Davis. (*Id.* ¶ 35.) In addition, Paramedic Victoria Furlow

did not work on October 1, 2002. (*Id.* ¶ 31.)

## H.    Medical Treatment

Around 7:00 p.m. on October 1, 2002, physician's assistant Barbara Davis wrote James

Davis a prescription for Routine A, gave Davis a dose of Routine A, and provided him with six

doses of both Compazine and Loperamide. (Sheriff's Def.'s Stmt. ¶ 53; Cermak Def.'s Stmt ¶

39.) Routine A is a treatment of certain prescription drugs that alleviates withdrawal symptoms.

(Sheriff's Def.'s Stmt. ¶¶ 53, 55; Cermak Def.'s Stmt ¶ 37.) Often, physician's assistants

prescribe Compazine and Loperamide in tandem with Routine A to help with vomiting and

diarrhea. (Cermak Def.'s Stmt. ¶ 38.)

Deidre Davis testified that on October 2, 2002, she talked to her husband who told her

that he had received something the night before, but that it did not help because he was still in

pain. (Sheriff's Def.'s Stmt. ¶ 56.) Also, Deidre Davis testified that she called the jail's general

telephone number and eventually spoke with Lieutenant Mackey. (*Id.* ¶ 57.) She explained to

7

Lieutenant Mackey that her husband was serving a ten-day sentence for a traffic violation, that he was on a Methadone program, and that he had not received any Methadone since he was admitted on September 27, 2002. (*Id.*) According to Deidre Davis' deposition testimony, Lieutenant Mackey replied that sometimes that happens and that Davis must have slipped through the cracks. (*Id.* ¶ 59.) She also testified that Lieutenant Mackey stated that Davis must not be in the part of the jail where he can get Methadone. (*Id.*) According to Deidre Davis, Lieutenant Mackey assured her that as soon as they were off the telephone, she would make sure that Davis was moved to the part of the jail where he could get Methadone. (*Id.* ¶ 60.) Deidre Davis further testified that about three minutes after her telephone call with Lieutenant Mackey, her husband called her and asked her what she did to "piss off" Lieutenant Mackey. (*Id.* ¶ 61.) Deidre Davis testified that Lieutenant Mackey told James Davis that he would have to wait before he went to the part of the jail where he could take Methadone because that part of the jail was full. (*Id.*)

Lieutenant Mackey recalls her telephone conversation with Deidre Davis and that James Davis approached her and stated that he wanted to take Methadone. (*Id.* ¶ 62.) At her deposition, Lieutenant Mackey testified that James Davis showed her his prescription for Routine A and told her that he had filled out his Methadone referral card two days earlier. (*Id.* ¶¶ 62, 63.) Further, Lieutenant Mackey testified that while Davis was standing there she called a paramedic to see if Davis had been approved for his Methadone treatment to which the paramedic replied that Davis' treatment had yet to be approved. (*Id.* ¶ 66.) Lieutenant Mackey then told Davis that the paramedic was aware of his need for Methadone. (*Id.*) Thereafter, she called a nurse at the jail and asked the nurse to come over and administer Routine A to Davis. (*Id.* ¶ 67.)

8

Shortly thereafter, Sergeant Carter from Division 8 called Lieutenant Mackey stating that there was an "irate lady on the phone, and she wanted to talk to whoever was in charge of Dorm 4." (*Id.* ¶ 68.) Lieutenant Mackey testified that the person said "Sergeant" Carter from Division 8 and not "Officer" Carter from Division 2. (*Id.* ¶ 69.) Sergeant Carter then transferred the call to Lieutenant Mackey who then spoke with Deidre Davis. (*Id.* ¶ 70.) Deidre Davis explained to Lieutenant Mackey that her husband needed his Methadone after which the Lieutenant explained how the Methadone program worked. (*Id.*) After her telephone conversation with Deidre Davis, Lieutenant Mackey testified that she told James Davis to lie down and wait for the paramedics to get there. (*Id.*)

On October 2, 2002, James suffered a cerebral aneurysm and on October 3, 2002, Davis died. (*Id.* ¶ 74.) The Deputy Medical Examiner of the Office of the Medical Examiner of Cook County concluded that Davis' cause of death was due to a hemorrhage caused by a cerebral artery aneurysm and that hypertensive cardiovascular disease was a significant contributing factor in Davis' death. (Sheriff's Def.'s Stmt., Ex N, at 1-2).[1]

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

---

[1] When voluntarily dismissing her wrongful death claims, Plaintiff acknowledged that the aneurysm was unrelated to the fact that Davis did not receive Methadone.

*Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The party

seeking summary judgment has the burden of establishing the lack of any genuine issue of

material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265

(1986). The existence of a factual dispute is not sufficient to defeat a summary judgment motion,

instead the non-moving party must present definite, competent evidence to rebut the summary

judgment motion. *See Vukadinovich v. Board of Sch. Trs.,* 278 F.3d 693, 699 (7th Cir. 2002)

(quotation and citation omitted). The Court considers the evidence in a light most favorable to

the non-moving party and draws all reasonable inferences in her favor. *See Anderson,* 477 U.S.

at 255.

## ANALYSIS

I.     **Deliberate Indifference – Counts I and IV**

     A.     **Personal Involvement**

       Plaintiff brings Counts I and IV pursuant to 42 U.S.C. § 1983 contending that Defendants

were deliberately indifferent to James Davis' serious medical needs because they denied him

Methadone. Section 1983 creates a federal cause of action for "the deprivation, under color of

law, of a citizen's rights, privileges, or immunities secured by the Constitution or laws of the

United States." *See* 42 U.S.C. § 1983; *Livadas v. Bradshaw,* 512 U.S. 107, 132, 114 S.Ct. 2068,

129 L.Ed.2d 93 (1994). For an individual to be liable under Section 1983, he or she must have

participated directly in the constitutional violation. *See Palmer v. Marion Cty.,* 327 F.3d 588,

594 (7th Cir. 2003). "Section 1983 creates a cause of action based on personal liability and

predicated upon fault; thus, liability does not attach unless the individual defendant caused or

participated in a constitutional deprivation." *Vance v. Peters,* 97 F.3d 987, 991 (7th Cir. 1996).

In other words, Plaintiff must establish that each Defendant "acquiesced in some demonstrable way in the alleged constitutional violation." *Palmer*, 327 F.3d at 594.

### B.     Deliberate Indifference

#### 1.     Eighth Amendment Standard

Deliberate indifference claims fall under the Cruel and Unusual Punishment Clause of the Eighth Amendment which protects inmates from a prison official's deliberate indifference to a serious injury or medical need. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). To establish "deliberate indifference" a plaintiff must show that (1) he suffered from an objectively serious medical condition or need, and (2) the officials subjectively knew of and disregarded his needs. *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Palmer*, 327 F.3d at 594. Negligence or gross negligence on the part of the official is not sufficient to establish liability, instead an official must act in an intentional or criminally reckless manner. *Farmer*, 511 U.S. at 837.

#### 2.     Prison Official's Duty under Eighth Amendment

"A prison official's duty under the Eighth Amendment is to ensure reasonable safety." *Farmer*, 511 U.S. at 844-45 (citation and internal quotation omitted). As such, a prison official who knows of a substantial risk to an inmate's health cannot be held liable if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* Specifically, deliberate indifference "is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05. "[W]hether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be

11

found liable under the Cruel and Unusual Punishments Clause." *Farmer*, 511 U.S. at 845 (italics omitted).

### 3.    Recent Seventh Circuit Case Law

Recently, the Seventh Circuit decided a deliberate indifference claim. *See Foelker v. Outagamie Cty.*, 394 F.3d. 510 (7th Cir. 2005). In *Foelker*, the Seventh Circuit focused on whether the inmate's Methadone treatment was a "serious medical need" under the standard enunciated by the Supreme Court decision in *Estelle*. Specifically, Defendants argued that the inmate had failed to present evidence of a serious medical need because he did not show that he was in pain or extreme distress. *Id.* at 513. In rejecting Defendants' arguments, the *Foelker* Court explained that a "'serious' medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 512. Here, the Sheriff's Office Defendants do not contest the fact that Davis suffered from a serious medical need or condition for purposes of their motions for summary judgment. (R.118-1, Sheriff's Office Def.'s Reply Memorandum, at 11.)

The *Foelker* decision is nonetheless instructive because the facts in *Foelker* have some similarity to the facts in the present matter. In *Foelker*, an inmate suffered from drug withdrawal while he was serving a sentence for a traffic violation in the Outagamie County, Wisconsin Jail. *Id.* at 511-12. At his arrival, the inmate, Richard Foelker, informed a registered nurse that he needed a dose of Methadone to avoid going into withdrawal. *Id.* The next day, the jail's nursing coordinator evaluated Foelker and told him that he would not receive Methadone treatments during his incarceration because he had been off the drug for three days. *Id.* at 512. Nevertheless, the nursing coordinator called the Methadone program administrator who stated

12

that Foelker should receive a reduced dose of Methadone. *Id.* The Methadone never made it to the jail, and thus Foelker never took Methadone while incarcerated. *Id.*

During his third day in jail, Foelker defecated on himself and the floor which the registered nurse thought was Foelker's attempt at playing the system. *Id.* The nurse then arranged for a social worker to evaluate Foelker. *Id.* After her examination, the social worker found that Foelker was confused, disoriented, and was hearing voices, yet she did not order any immediate medical attention. *Id.* The next day, Foelker defecated on the floor and was hallucinating that he was in a "wedding hotel" waiting to get married. *Id.* At that time, the jail doctor recommended that the registered nurse give Foelker a dose of Thiamine, a drug used for alcohol withdrawal. *Id.* Despite the Thiamine, Foelker did not get better and was sent to the hospital with acute delirium. *Id.*

The Seventh Circuit determined that a reasonable jury could conclude that the social worker and nurse were more than negligent in their assessment of Foelker's medical condition. *Id.* at 513. Specifically, the *Foelker* Court relied on the facts that when the nurse checked on Foelker, the nurse did not recommend further medical attention even though Foelker had defecated on himself and the floor. *Id.* The Seventh Circuit also concluded that although the nurse thought Foelker was playing the system, a reasonable jury could conclude that the nurse knew Foelker had not taken his Methadone and was exhibiting signs of withdrawal, and thus the nurse knew that something was seriously wrong with him. *Id.* Therefore, a reasonable jury could conclude that the nurse recklessly or maliciously allowed the situation to fester. *Id.* Similarly, the Seventh Circuit concluded that a reasonable jury could conclude that the social worker intentionally allowed Foelker to suffer from the effects of his Methadone withdrawal. *Id.*

13

## C.  Sheriff's Office Defendants

Because the Sheriff's Office Defendants do not contest the fact that Davis suffered from a serious medical need or condition for purposes of their motions for summary judgment, the Court need not examine whether Davis' Methadone treatment program was a "serious medical need" under the *Estelle/Farmer* framework.  Instead, the Court turns to whether a reasonable jury could conclude that Defendants were deliberately indifferent to James Davis' need for Methadone.

### 1.  Officer Collier & Correctional Rehabilitation Worker Bowers

Plaintiff contends that both Regina Bowers and Officer Gregory Collier were aware that Davis' medical condition was serious, yet they did not provide any medical attention to reduce his suffering.  Plaintiff therefore claims that Bowers and Collier were deliberately indifferent to Davis' serious medical needs.

The facts in the record reveal that on the morning of October 1, 2002, some inmates told Officer Collier that Davis was ill because he was withdrawing from drugs and needed medical attention.  Indeed, when Officer Collier first saw Davis he complained that his stomach hurting.  Officer Collier then escorted Davis to see a Correctional Rehabilitation Worker, Regina Bowers.  Officer Collier explained to Bowers that Davis needed some medical attention and requested that Bowers call the paramedics' office to get Davis some help.  Bowers then asked Davis what was wrong with him to which Davis replied that he was dope sick and that his stomach was hurting.  Shortly thereafter, Bowers talked to a paramedic and then explained to Davis that it may take up to three days to verify that he was in an approved Methadone program.[2]  After this incident,

---

[2]  Plaintiff claims that Bowers did not talk to a paramedic on October 1, 2002.  To establish this fact, Plaintiff cites to a portion of the record that does not support her claim.  Therefore, Plaintiff has failed to support her factual assertions as required under Local Rule 56.1.

Officer Collier called his supervisor, Sergeant Martin, to inform him of Davis' situation.

At her deposition, Bowers testified that the paramedic explained that it would take up to three days for Davis to get Methadone. Bowers also testified that after she talked to the paramedic, she explained the situation to Davis. In addition, Bowers testified that she spoke with Sergeant Martin in the presence of Davis to ask Sergeant Martin to excuse Davis from work that day. Thereafter, Sergeant Martin excused Davis from working on October 1, 2002.

To preclude summary judgment, Plaintiff must come forward with facts "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. To establish deliberate indifference, Plaintiff must show that the prison official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837. Here, Plaintiff fails to demonstrate a genuine issue of material fact on this point. Specifically, Plaintiff has not come forward with evidence that Officer Collier and Bowers intentionally disregarded Davis' need for Methadone. Instead, the record reflects that both Officer Collier and Bowers attended to Davis' needs by contacting the paramedics concerning the matter. Unlike the situation in *Foelker* where the nurse thought the inmate was trying to "play the system" after the inmate defecated on himself and the social worker did not order any medical treatment after finding the inmate disoriented and hearing voices, once Officer Collier and Bowers became aware of Davis' need for Methadone, they took immediate action to provide him medical treatment. Accordingly, Collier and Bowers reasonably responded to Davis' serious medical need. *Farmer*, 511 U.S. at 844-45.

---

*See Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Further, evidence in the record other than Officer Collier's and Bower's deposition testimony reveals that the paramedics were contacted about Davis' Methadone treatment needs prior to October 2, 2002. (Sheriff's Def.'s Stmt. ¶ 66).

Viewing the facts and all reasonable inferences in favor of Plaintiff, she has failed to establish a genuine issue of material fact that Officer Collier and Bowers were deliberately indifferent to Davis' medical needs. Therefore, the Court dismisses Officer Collier and Correctional Rehabilitation Worker Bowers from Count I of the Third Amended Complaint.

### 2. Sergeant Martin

Next, Plaintiff contends that Sergeant Martin was deliberately indifferent to James Davis' medical needs because Sergeant Martin had the duty to contact a paramedic and the responsibility to decide whether an inmate needed immediate medical assistance. Although Sergeant Martin testified that it was his responsibility, not the social worker's, to make the decision whether an inmate needs immediate medical assistance, Plaintiff's contention does not support the conclusion that Sergeant Martin intentionally or recklessly disregarded Davis' medical needs. Here, Officer Collier and Bowers had already decided that Davis needed immediate medical assistance before Sergeant Martin even knew of the situation.

Under the *Estelle/Farmer* framework, Sergeant Martin had the duty to reasonably respond to Davis' medical need. *See Farmer,* 511 U.S. at 844-45. Here, Officer Collier notified Sergeant Martin that Davis was in need of his Methadone treatment after Officer Collier and Bowers had contacted the paramedics. Because Officer Collier and Bowers had already determined that Davis needed medical assistance, Sergeant Martin's failure to contact the paramedics after the fact is not unreasonable conduct. Seventh Circuit case law supports the Court's conclusion. In cases where courts have concluded that prison officials did not reasonably respond to an inmate's medical needs, the officials actually refused to provide medical treatment to the inmate. *See Walker v. Benjamin,* 293 F.3d 1030, 1040 (7th Cir. 2002) (collecting cases).

16

Viewing the evidence in a light most favorable to Plaintiff and drawing all reasonable inferences in her favor, the facts do not support the conclusion that Sergeant Martin was deliberately indifferent to Davis' medical needs. Thus, the Court dismisses Sergeant Martin from Count I of the Third Amended Complaint.

### 3.     Officer Carter

Plaintiff contends that on October 1, 2002, she spoke with a "Sergeant" Carter concerning her husband's medical needs and alleges that "Sergeant" Carter told her that Cook County does not work fast and that maybe Davis would get some medication the next day. As such, Plaintiff contends that "Officer" Yolanda Carter, a named Defendant to this lawsuit, was deliberately indifferent to James Davis' medical needs.

On October 1, 2002, Officer Yolanda Carter was assigned as a security officer to Division 2 in Dorm 1 of the Cook County Jail. At that time, James Davis was located in Division 2, Dorm 4. While in the security office, Officer Carter did not have any contact with the inmates. In general, when Officer Carter received telephone calls from family members of inmates regarding their health, she transferred the calls to the supervisor of the dorm where the inmates were housed. Further, Officer Carter testified that she has no recollection of talking to Deidre Davis or any other family member of James Davis on that day. Also, there is evidence in the record that a Sergeant Carter from Division 8 spoke to Deidre Davis, not Officer Yolanda Carter in Division 2. Sergeant Carter is not a named Defendant in this lawsuit and Officer Yolanda Carter does not have the rank of Sergeant.

Viewing the evidence in a light most favorable to Plaintiff and drawing all reasonable inferences in her favor, Plaintiff has failed to set forth evidence creating a genuine issue of

17

material fact that Officer Yolanda Carter was deliberately indifferent to Davis' medical needs.

Even assuming Plaintiff spoke to "Officer" Carter, Officer Carter's alleged comment that Davis

may get treatment the following day does not rise to the level of intentionally or recklessly

disregarding Davis' medical needs because there is no evidence in the record that Officer Carter,

a security officer, had any control over Davis' medical treatment or that she had any contact with

Davis himself. *See Palmer*, 327 F.3d at 594 (official must have participated directly in

constitutional violation). Further, evidence in the record indicates that once "Sergeant" Carter

talked to Deidre Davis, Sergeant Carter transferred the telephone call to Lieutenant Mackey, the

supervisor of the dorm where Davis was housed. Therefore, it cannot be inferred from these

facts that Officer Carter somehow intentionally or recklessly denied, delayed, or interfered with

Davis' access to his Methadone treatment. *See Estelle*, 429 U.S. at 104-05. Instead, transferring

the telephone call to Lieutenant Mackey was a reasonable response to Deidre Davis' request. *See*

*Farmer*, 511 U.S. at 844-45. Thus, the Court dismisses Officer Yolanda Carter from Count I of

the Third Amended Complaint.

### 4. Lieutenant Mackey

Plaintiff testified that after she talked on the telephone to Lieutenant Mackey explaining

James Davis' need for Methadone, she talked to her husband on the telephone. In that telephone

conversation, James Davis told his wife that Lieutenant Mackey was "pissed off" and that

Lieutenant Mackey told him that he was going to have to wait until he could go to the part of the

jail where he could get Methadone because that part of the jail was full. Based on these

telephone conversations, Plaintiff contends that she has established a genuine issue of material

fact that Lieutenant Mackey was deliberately indifferent to James Davis' need for Methadone.

18

Deidre Davis' deposition testimony about her telephone conversation with her husband contains inadmissible hearsay. In other words, Deidre Davis' version of James Davis' account of what Lieutenant Mackey said to him is not enough to preclude summary judgment. *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997) ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial"). Further, Plaintiff does not even attempt to argue that this testimony is admissible under any hearsay exceptions.

In any event, even if the Court admitted this testimony at trial, the undisputed evidence in the record indicates that Lieutenant Mackey responded reasonably to James Davis' medical needs. *See Farmer,* 511 U.S. at 844-45 (official cannot be found liable if he reasonably responded to risk, even if the harm not averted). Specifically, after James Davis talked to Lieutenant Mackey about his need for Methadone, Lieutenant Mackey confirmed that Davis had been administered Routine A.[3] Lieutenant Mackey then contacted a nurse to make sure that Davis had been verified for the Methadone program. After the nurse said he had not been verified, the nurse informed Lieutenant Mackey that she was familiar with Davis' medical needs. After that, Lieutenant Mackey telephoned the paramedics to see when the paramedics could dispense medication to Davis. Unlike *Foelker* where the nurse thought the prisoner was trying to "play the system" and the social worker did not order any medical treatment after finding the inmate disoriented and hearing voices, Lieutenant Mackey, who is not a health care provider,

---

[3] Although the parties do not dispute that Davis' Methadone treatment was a serious medical need for purposes of summary judgment, the Court notes that while Davis was waiting for his Methadone treatment, a physician's assistant treated him with Routine A, Compazine, and Loperamide to relieve his withdrawal symptoms. Under the Eighth Amendment, inmates have the right to medication for serious medical needs, but do not have the right to a particular medical treatment. *See, e.g., Meriwether v. Faulkner,* 821 F.2d 408, 413 (7th Cir. 1987).

contacted jail health care providers, specifically a nurse and a paramedic, about Davis' serious medical needs.

Based on these undisputed facts, Plaintiff has not established a genuine issue of material fact that Lieutenant Mackey intentionally or recklessly disregarded Davis' medical needs. *See Farmer,* 511 U.S. at 834. Therefore, the Court dismisses Lieutenant Mackey from Count I of the Third Amended Complaint.

### D.      Cermak Health Services Defendants

Plaintiff voluntarily dismisses paramedic Victoria Furlow from this action because there is uncontroverted evidence that paramedic Furlow did not work on October 1, 2002. (R.99-1, Pl.'s Memorandum of Law in Opposition, at 10 n.1). The undisputed evidence also reveals that the other paramedics named in this action, Peggy Westbrook, Richard Patton, Dalfanita Moore, and Alfonso Hill, did not talk to social worker, Regina Bowers, on the telephone on October 1, 2002, or do not recall talking to her. Although Bowers testified that she talked to a paramedic on that date, Plaintiff fails to present definite, competent evidence that any of the named paramedic Defendants actually talked to Bowers. Accordingly, Plaintiff has failed to establish that these paramedics had any personal involvement with the decedent. *See Palmer,* 327 F.3d at 594. Furthermore, Plaintiff fails to present any competent evidence that these paramedics knew James Davis needed Methadone and yet disregarded his needs. *See Farmer,* 511 U.S. at 834. Plaintiff has failed to established a genuine issue of material fact that the paramedics had personal involvement or were deliberately indifferent to James Davis' medical needs. Accordingly, the Court dismisses Defendants Peggy Westbrook, Richard Patton, Dalfanita Moore, and Alfonso Hill from Count IV of the Third Amended Complaint.

## II.    Survival Actions – Counts II and V

In Count II and V of the Third Amended Complaint, Plaintiff brings state law claims pursuant to the Illinois Survival Act. *See* 755 ILCS 5/27-6. Plaintiff, however, has failed to make any arguments in support of her Illinois Survival Act claims, and thus she has waived these claims. *See Estate of Moreland v. Dieter,* 395 F.3d 747, 759 (7th Cir. 2005) ("Perfunctory or undeveloped arguments are waived"); *Volvosek v. Wisconsin Dep't of Agr. Trade & Consumer Protection,* 344 F.3d 680, 689 n. 6 (7th Cir. 2003) (complete absence of legal argument waives consideration of claim). Because Plaintiff has waived her Illinois Survival Act claims, the Court dismisses Counts II and V of the Third Amended Complaint as a matter of law.

## III.    Monell Claim – Count III

In Count III of the Third Amended Complaint, Plaintiff contends that Cook County, through its department Cermak Health Services, has a policy of delaying Methadone treatment to new inmates of Cook County Jail for at least three days, and thus the County violated Plaintiff's constitutional rights. To establish that Cook County is liable under this theory, Plaintiff must show that (1) the decedent was deprived a federal right, (2) as a result of an express municipal policy, widespread custom, or deliberate act of a decision-maker for Cook County, which (3) proximately caused his injury. *See Monell v. Department of Soc. Servs. of New York,* 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *Estate of Morleand,* 395 F.3d at 758-59.

Here, Plaintiff has made cursory allegations and arguments that Cermak Health Services has a widespread practice or policy of denying inmates Methadone treatments for up to one week. Plaintiff, however, fails to cite any legal authority supporting her claim. For example, Plaintiff does not cite or refer to *Monell* which is the seminal Supreme Court case that sets the

standard for an express policy or custom claim under 42 U.S.C. § 1983. The Seventh Circuit has repeatedly recognized that perfunctory and undeveloped arguments, that are not supported by pertinent authority, are waived even if those arguments raise constitutional claims. *See Estate of Moreland,* 395 F.3d at 759; *LINC Fin. Corp. v. Onwuteaka,* 129 F.3d 917, 921 (7th Cir. 1997); *United States v. Berkowitz,* 927 F.2d 1376, 1384 (7th Cir. 1991). Therefore, Plaintiff has waived her *Monell* claim, and thus the Court dismisses Count III as a matter of law.

## CONCLUSION

For these reasons, the Court grants Defendants' Motions for Summary Judgment.

Dated: February 25, 2005

**ENTERED**

**AMY J. ST. EVE**
**United States District Court Judge**

22